# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of ~~July 26, 2019, by and between (a) Ken Garff Automotive, LLC d/b/a Ken Garff Automotive Group, Ken Garff Enterprises, LLC and Garff Warner Dodge, LLC d/b/a Ken Garff West Valley Dodge Chrysler Jeep Ram, each, a Utah limited liability company, jointly and severally (collectively,~~ September    , 2019, by and between (a) Impex Inc., d/b/a Impex Auto Sales, a North Carolina corporation (the "Buyer") and (b) JRV Group USA L.P., a Delaware limited partnership and debtor in possession (the "Seller") in chapter 11 case number 19-11095 (the "Case") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

**Formatted:** Justified

### RECITALS

A.    On May 13, 2019 (the "Petition Date"), the Seller commenced its Case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Seller has continued in the possession of its property and has continued to operate and manage it business pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On June 4, 2019, the Office of United States Trustee ("UST") appointed an Official Committee of Unsecured Creditors (the "Committee") in the Case.

**Formatted:** Justified

B.    Prior to the Petition Date, the Seller (then named Erwin Hymer Group USA L.P.) operated as a second-stage original equipment manufacturer and alterer (*i.e.*, "upfitter") of Jeep Wranglers. The Seller would add features to the vehicles, such as a roof-top tent for camping that would make them more desirable for recreational vehicle dealers to sell to end users/consumers. To do so, the Seller would remove original parts and replace them with the Seller's manufactured or purchased parts. Jeep Wranglers that were upfitted or expected to be upfitted by the Seller are referred to in this Agreement as "Upfitted Vehicles."[1]

C.    The great majority of the Seller's inventory of Upfitted Vehicles, however, may not be sold or leased to consumers because they are subject to National Highway Traffic Safety Administration ("NHTSA") recalls for being in excess of gross vehicle weight ratings (known as GVWR) and/or because their roof-top tent may crack and detach (which have been designated by NHTSA as recalls 19V-190 and 19V-320, respectively) (the "Recalls").

D.    The Buyer wishes to purchase and the Seller wishes to sell (the "Initial Sale"): (i) the Upfitted Vehicles listed by vehicle identification number ("VIN") in **Exhibit A** to this Agreement (the "On-Site Upfitted Vehicles"), which are currently located at the Seller's premises (the "Premises"); (ii) the parts of the Seller's dismantled Upfitted Vehicles set forth in **Exhibit B** to this Agreement (the "Dismantled Vehicles");[2]

---

[1] The term Upfitted Vehicle includes the relevant Upfitted Vehicle's rear seat if removed.
[2] The term Dismantled Vehicle includes all parts removed from the relevant Dismantled Vehicle.

1

and (iii) the Seller's "demo" vehicles, which are Upfitted Vehicles that had been provided to former employees and others for their use ("Demo Vehicles") that are currently located at the Premises, which are listed in **Exhibit C** to this Agreement (the "On-Site Demo Vehicles").

E.    Also, the Buyer wishes to purchase and the Seller wishes to sell (each, an "Additional Sale"):  (i) certain of Seller's vehicle parts that are not from Dismantled Vehicles, including all factory, takeoff and aftermarket parts as set forth in **Exhibit D** to this Agreement (the "Parts"); (ii) all of the Seller's Upfitted Vehicles listed in **Exhibit E** to this Agreement that are turned over or otherwise returned to the Seller by a dealer (the "Returned Dealer Vehicles"); (iii) all of the Seller's Demo Vehicles that may be turned over or otherwise returned to the Seller, which are listed in **Exhibit F** to this Agreement (the "Returned Demo Vehicles"); (iv) the Seller's furniture, fixtures and equipment and other fixed assets listed in **Exhibit G** to this Agreement (the "Fixed Assets"); (v) the Upfitted Vehicles listed in **Exhibit H** to this Agreement (the "Repurchased Consumer Vehicles") which were purchased or will be purchased from consumers as contemplated by the Bankruptcy Court order designated as Docket No. 79 in the Case (the "Consumer Vehicles Repurchase Order"); and (vi) the miscellaneous parts listed in **Exhibit I** to this Agreement (the "Additional Parts").

F.    Each of the items listed in **Exhibits A, B, and C** are referred to in this Agreement as the "Initial Assets," which will be sold by the Seller and purchased by the Buyer at the Closing on the Closing Date (as such terms are defined below); each of the items listed in **Exhibits D, E, F, G, H and I** are referred to as the "Additional Assets," and, collectively, the Initial Assets and any Additional Assets are referred collectively to as the "Assets."  Collectively, the Initial Sale and all Additional Sales (no matter when occurring) are referred to collectively as the "Sale".

G.    The Buyer agrees to serve as "stalking horse" bidder and the closing of each Sale (each, a "Closing") shall be subject to Bankruptcy Court approval after notice and a hearing on a motion for bidding procedures and sale (the "Bidding Procedures and Sale Motion") in form and substance consistent with **Sections 8 and 9** of this Agreement and otherwise reasonably acceptable to the Seller, Buyer, Committee and DIP Lender (as defined below).

**NOW, THEREFORE**, the parties to this Agreement (each, a "Party" and, collectively, the "Parties") acknowledge the accuracy of the foregoing recitals and incorporate them in their agreement below, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, agree as follows:

1.    Sale.

1.1    Purchase and Sale of Assets.  On the Closing Date (as defined below) in consideration of the covenants, representations and obligations of Buyer hereunder, and subject to and upon the terms, conditions, disclaimers and acknowledgments hereinafter set forth (including, without limitation, those set forth in Section 6 below), Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller all of Seller's right, title and interest in the Initial Assets on an "as is," "where is" and "with all faults" basis, with no representations or warranties

2

that survive Closing. When Additional Assets become available to the Seller (*e.g.*, if an Upfitted Vehicle is turned over or otherwise returned to the Seller and the Seller has in its possession the related MSO), Additional Sale dates may be scheduled by the Parties (after the Seller consults with the Committee and DIP Lender).[3]  On one or more Additional Sale dates, in consideration of the covenants, representations and obligations of Buyer hereunder, and subject to and upon the terms, conditions, disclaimers and acknowledgments hereinafter set forth (including, without limitation, those set forth in <u>Section 6</u> below), Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller all of Seller's right, title and interest in the Additional Assets on an "as is," "where is" and "with all faults" basis, with no representations or warranties that survive Closing of such Additional Sale(s).

      1.2   <u>Excluded Assets</u>.  The Assets shall be limited to those items specifically identified or described in **Exhibits A, B, and C** to this Agreement, and as and when purchased by the Buyer under this Agreement, any or all of the items specifically identified or described in **Exhibits D, E, F, G, H and I** to this Agreement, which may be at or after the Closing Date.  All other property of the Seller's chapter 11 estate (the "<u>Estate</u>") (*i.e.*, property that is not specifically identified or described in such exhibits) shall not be included in the Sale, shall not be included in the definition of Assets and shall remain property of the Estate before and after each Closing (the "<u>Excluded Assets</u>").

      1.3   <u>Instruments of Transfer</u>.  On the Closing Date, the Sale shall be made to Buyer by (a) one or more bills of sale in forms acceptable to both Parties, the Committee and the DIP Lender[4] (individually or collectively in context, the "<u>Bill of Sale</u>") and (b) delivery of the Manufacturer's Statements of Origin ("<u>MSOs</u>"), also known as Manufacturer's Certificates of Origin, for the Upfitted Vehicles and the Dismantled Vehicles as provided in Section 2.4.

2.   <u>Consideration</u>.

   2.1   <u>Consideration to Seller</u>.

      (a) The cash consideration to be paid by Buyer to Seller for the Sale of the Initial Assets shall be: (i) $25,~~000~~750.00 for each On-Site Upfitted Vehicle (collectively, the "<u>On-Site Upfitted Vehicles Cash Amount</u>"); (ii) $17,~~000~~500.00 for each Dismantled Vehicle (collectively, the "<u>Dismantled Vehicles Cash Amount</u>"); and (iii) $25,~~000~~750.00 for each On-Site Demo Vehicle (collectively, the "<u>On-Site Demo Vehicles Cash Amount</u>") for an aggregate purchase price for the Initial Assets of $7,~~585,000~~812,250.00 (the "<u>Initial Cash Amount</u>").  Subject to subsection (d) of this Section, the Seller and Buyer expect that the Buyer will purchase all of the 52 Returned Dealer Vehicles that are turned over or otherwise returned to the Seller for $25,~~000~~750.00 each, reasonably adjusted

---

[3] There shall be no minimum number of Additional Assets or related amount of Sale price required for the scheduling of an Additional Sale date.

[4] The term "<u>DIP Lender</u>" shall have the definition given to it in the Bankruptcy Court's interim order in the Case designated as Docket No. 29.

DOCS_LA:323381.4 47430/002

for condition, including (without limitation) mileage (collectively, the "Returned Dealer Vehicles Cash Amount"), for an estimated aggregate expected purchase price of $1,~~300~~450,000 if all 52 Returned Dealer Vehicles are returned to the Seller and sold to the Buyer. Also, the cash consideration for the Buyer's purchase from the Seller of each Returned Demo Vehicles (collectively, the "Returned Demo Vehicles Cash Amount") shall be $25,~~000~~750.00, reasonably adjusted for condition, including (without limitation) mileage. Additionally, the cash consideration to be paid by the Buyer to the Seller for each Repurchased Consumer Vehicle shall be an amount agreed to in good faith for each such vehicle in light of condition, including (without limitation) mileage (collectively, the "Repurchased Consumer Vehicles Cash Amount"). Further, the cash consideration to be paid by the Buyer to the Seller for any or all Parts, Additional Parts and Fixed Assets shall be negotiated by the Parties in good faith in a manner consistent with the terms of this Agreement for a mutually agreeable price by August 2, 2019 at 11:59 p.m. Pacific time or if there is no such agreement by such date and time such Additional Assets shall no longer be part of any Additional Sale under this Agreement and shall remain property of the Estate. The consideration for the purchase and sale of Additional Assets is referenced in this Agreement as the "Additional Cash Amount," and the Initial Cash Amount and the Additional Cash Amount are collectively referred to in this Agreement as the "Cash Amount."[5]

(b) The Initial Cash Amount for the Initial Sale and the Additional Cash Amount for each Additional Sale shall be paid at the Closing of each such Sale by the Buyer to the Seller in immediately available funds, in United States dollars and shall not be subject to reduction by way of setoff or counterclaim ("Good Funds"), together with any other amounts Buyer may be required to pay pursuant to the terms and provisions of this Agreement (collectively, the "Purchase Price").

(c) The Buyer and Seller each acknowledge that the Buyer has made a $100,000 refundable deposit (the "Initial Deposit") in connection with the entry into this Agreement. Within three (3) business days of the execution and delivery of this Agreement by both Parties, the Buyer shall wire transfer to Seller in Good Funds an additional deposit of $~~279,250~~290,612.00 (the "Additional Deposit"), which is equal to

---

[5] As stated above, the Parties agree to negotiate reasonably and in good faith for Additional Sale(s); however, the failure of the Parties to agree on the identity or purchase price for some or all of the Additional Assets for such Additional Sale(s) shall not affect the obligations of each Party under this Agreement regarding the Initial Sale. For Parts, Additional Parts or Fixed Assets that were not included in the Initial Sale, if the Parties do not reach an agreement for the purchase of such Assets by August 2, 2019, then the Seller shall no longer have any obligation under this Agreement to continue to sell such Assets to the Buyer. For Returned Dealer Vehicles, Returned Demo Vehicles and Repurchased Consumer Vehicles, the Seller shall arrange for and pay for transportation of each such vehicle to a dealership of the Buyer, with such dealership to be chosen reasonably by Buyer. If the Parties do not reach an agreement for the purchase price of such particular vehicle within ten (10) business days after the Buyer has received possession of such vehicle at one of its designated dealerships, then the Seller shall no longer have any obligation under this Agreement to continue to sell such vehicle to the Buyer. If no agreement is reached during the initial ten (10) day period, then the Buyer shall store such vehicle on behalf of the Seller at such dealership for up to thirty (30) calendar days at no cost to the Seller.

4

five percent (5%) of the Initial Cash Amount ($7,~~585,000~~812,250.00) net of the Initial Deposit ($100,000).    The Initial Deposit and Additional Deposit (totaling $~~379,250~~390,612.00) are referred to herein, collectively, as the "Deposit."  The Deposit shall be held by the Seller in a separate debtor in possession bank account with any other bidders' deposits.  Upon execution and delivery of this Agreement by the Parties, the Deposit shall become non-refundable unless:  (i) other than while the Buyer remains a Back-Up Bidder (as defined below), the Buyer is not the successful bidder for the Assets; or (ii) this Agreement is terminated for any reason other than a breach by the Buyer.

(d)   The Seller and Buyer hereby agree to the "as is, where is and with all faults" (as set forth in Section 6) purchase and sale of each Returned Dealer Vehicle, both pre-initial Closing and for a period of four (4) months post-initial Closing, provided that (i) no modifications have been made to such Returned Dealer Vehicles other than modifications performed by the Seller and such modifications are substantially similar to the Upfitted Vehicles, (ii) there is no material damage to such Returned Dealer Vehicle; (iii) such Returned Dealer Vehicle has not been owned or registered in any name other than the applicable dealer and (iv) the mileage on such Returned Dealer Vehicle does not exceed 500 miles.  As stated above, the purchase price for each Returned Dealer Vehicle shall be $25,000, reasonably adjusted for condition, including (without limitation) mileage, in cash consideration, which shall be paid promptly upon the Buyer's receipt of such Returned Dealer Vehicles from the Seller together with the applicable Bills of Sale and MSOs duly endorsed for transfer to Buyer in form sufficient to register the Returned Dealer Vehicles in the name of the Buyer.  Buyer is under no obligation to purchase Returned Dealer Vehicles not meeting the foregoing conditions and any Returned Dealer Vehicles not meeting the foregoing conditions and, therefore, not purchased by Buyer shall not be considered part of the Assets and shall remain property of the Estate.  Any Returned Dealer Vehicles that are purchased by the Buyer hereunder shall become Assets, including (without limitation) for the purposes of Section 10.

(e)   The Buyer and Seller shall enter into good faith negotiations with respect to the "as is, where is and with all faults" (as set forth in Section 6) purchase and sale for cash consideration in amounts to be determined as part of such negotiations of Returned Demo Vehicles and/or Repurchased Consumer Vehicles that may be obtained by the Seller pre- or post-initial Closing.  The negotiated purchase price for each such Returned Demo Vehicles and/or Repurchased Consumer Vehicles shall be paid in cash consideration, which shall be paid promptly upon the Buyer's receipt of such vehicles from the Seller together with the applicable Bills of Sale and MSOs or other title transfer documentation duly endorsed for transfer to Buyer in form sufficient to register such vehicles in the name of the Buyer.  Any such vehicles that are purchased by the Buyer hereunder shall become Assets, including (without limitation) for the purposes of Section 10.  Subject to the terms of this Section, the Buyer shall be under no obligation to purchase Returned Demo Vehicles and/or Repurchased Consumer Vehicles.  Returned Demo Vehicles and Repurchased Consumer Vehicles not purchased by Buyer shall not be considered part of the Assets and shall remain property of the Estate.

(f)   At the initial Closing, the Buyer shall assume and thereafter pay, perform or discharge when due any and all Liabilities (as defined below) arising

5

from, in connection with or related to the Assets from and after the Closing Date, or with respect to any post-Closing Date transfer of any Additional Assets, as of the date of purchase of such Additional Assets (the "Assumed Liabilities").  For the avoidance of doubt, from and after the Closing, the Assumed Liabilities shall only be obligations of the Buyer, and shall not be obligations of the Seller, any of its affiliates or any of its or their respective equity holders.  For the avoidance of doubt, until Closing occurs, all Liabilities related to the Assets are Liabilities of Seller and not of any of its affiliates or any of its or their respective equity holders.  "Liabilities" shall mean all liabilities, claims, damages, demands, expenses, commitments, obligations, costs and expenses (whether accrued or not, known or unknown, disclosed or undisclosed, matured or unmatured, fixed or contingent, asserted or unasserted, liquidated or unliquidated).

2.2     Closing Conference.  Each Closing shall take place at the offices of Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 19801 (in person or virtually by, e.g., electronic mail and/or telephone or video conference) or such other place as agreed to by the Parties in writing.

2.3     Closing Date.    The initial Closing (which shall include the purchase and sale of the Initial Assets) shall be held on the date that is no later than three (3) business days after the last of the closing conditions set forth in Section 3 is satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) (the "Closing Date").  Until this Agreement is either terminated or the Parties have agreed in writing upon an extended Closing Date, the Parties shall use reasonable best efforts to satisfy all conditions to Closing and the Sale shall close as soon as such conditions are satisfied or waived.

2.4     Seller's Deliveries to Buyer at the Initial Closing.  On the Closing Date, Seller shall make the following deliveries to Buyer:

2.4.1     The Bill of Sale (which, as stated above, may be one or more bills of sale) for the Assets purchased on such date.

2.4.2     The MSO for each of the On-Site Upfitted Vehicles, the On-Site Demo Vehicles and the Dismantled Vehicles, in each case, to be purchased on the Closing Date, duly endorsed for transfer by the Seller to Buyer in form sufficient to register all such vehicles in the name of the Buyer.[6]

2.4.3     A copy of the Bankruptcy Court's order approving the Sale and authorizing the Seller to proceed with such Sale containing the terms set forth in Section 9 (the "Approval Order") and otherwise in form and substance satisfactory to the Buyer, Seller, the Committee and the DIP Lender.

---

[6] To the extent that the Seller, in its sole discretion, has employee capacity to return On-Site Upfitted Vehicles and On-Site Demo Vehicles to their upfitted base model, Seller agrees to use reasonable efforts, with no additional out of pocket cost, to complete such work prior to the Closing Date, without any obligation or liability therefor.

6

     2.5   <u>Buyer's Deliveries to Seller at the Initial Closing</u>.  On the Closing Date, Buyer shall make or cause the following deliveries to Seller:

     2.5.1   The Cash Amount with respect to all Assets to be purchased at the Closing Date (including the Initial Cash Amount) by wire transfer to the Seller's debtor in possession operating account less the Deposit.

     2.5.2   A certificate or certificates of insurance evidencing that the Seller, the Seller's Chief Restructuring Officer (the "<u>CRO</u>") and any liquidating trustee has been added as a named insured on the Buyer's liability insurance policy or policies, including, without limitation, covering the product liability post-Sale (the "<u>Liability Insurance Policy</u>") that are in effect as of the Closing Date; provided, however, Buyer shall be obligated to pay any deductible or co-payment and expressly agrees that the coverage amounts under such Liability Insurance Policy shall not be deemed to limit Buyer's obligations to Seller or the other Indemnitees identified in the indemnification provisions set forth in this Agreement.

     2.5.3   Any such other documents, funds or other things contemplated by this Agreement to be delivered by Buyer to Seller at the Closing.

     2.6   <u>Sales, Use and Other Taxes</u>.  Any sales, purchases, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Assets is located, or any subdivision of any such state, which may be payable by reason of the Sale ("<u>Transfer Taxes</u>") shall be borne and timely paid by Buyer, with Buyer either paying the same in full to the applicable authority at the Closing or providing Seller with assurances in writing (reasonably satisfactory to Seller) of such timely payment at or prior to the Closing.  If Seller would be responsible for remitting the Transfer Taxes to the applicable authority, then Buyer shall pay or reimburse the amounts of such Transfer Taxes to the Seller in Good Funds at the Closing.  With respect to any Transfer Taxes, Buyer shall pay to Seller in Good Funds at the Closing the amount thereof reasonably estimated by Seller to be due and payable in connection with the Sale and Buyer and Seller shall make an appropriate adjustment between them after the Closing when the final amount of such taxes has been determined; provided that such taxes in connection with the Sale shall be borne by the Buyer.  The Buyer's obligations in this Section shall survive Closing indefinitely.

     2.7   <u>Possession</u>.  Right to possession of the Assets shall transfer to Buyer on the Closing Date.  Subject to the provisions of Section 6 below, Seller shall transfer and deliver to Buyer on the Closing Date all keys, fobs and owner's manuals to the Assets in Seller's possession and control.

     2.8   <u>Removal of Assets by Buyer</u>.  Not later than ten (10) business days following the later of:  (i) the Closing Date or (ii) the payment by the Buyer to the Seller of the Purchase Price for any Assets (other than as provided in <u>footnote 5</u> above), Buyer shall remove, or cause to be removed from the Seller's premises (the "<u>Premises</u>"), at Buyer's sole cost and expense, all of the Assets so purchased in accordance with the terms hereof.  Buyer shall cause the removal of Assets at any time to be accomplished in such manner as will minimize any damage to the Premises or any other assets of Estate or any other party having an interest in the Premises or any assets located at the Premises.

7

Buyer shall, at Buyer's sole cost and expense, immediately cause any damage to the Premises or any other assets resulting from Buyer's removal, handling, shipping, disposition or other activities in connection with the Premises to be fully and completely repaired or restored. As a condition to Buyer's right to enter upon the Premises to remove or cause the removal of the Assets, however, Buyer shall provide to Seller a certificate of insurance which names Seller, the Estate and Seller's affiliates as additional insureds and which evidences a general public liability insurance policy (issued by a reputable insurer, in an amount and otherwise in form and content satisfactory to Seller) which covers Seller and such other additional insureds against any loss, damage or Liability as Seller may suffer or incur in connection with Buyer's removal of the Assets as contemplated by this Section; provided, however, Buyer shall be obligated to pay any deductible or co-payment and expressly agrees that the coverage amounts under such Liability Insurance Policy shall not be deemed to limit Buyer's obligations to Seller or the other Indemnitees identified in the indemnification provisions set forth in this Agreement. As set forth in Section 10 below (and without limiting such Section), the Buyer holds harmless and indemnifies and shall pay (and shall contribute to) the Indemnitees (as defined in such Section) for any loss, Liability, claim, damage or expense (including, without limitation, reasonable attorney's fees and expense through all levels of appeal) arising from, in connection with or related to the Buyer's removal of any of the Assets from the Premises. It is expressly understood that Buyer shall bear any and all costs and expenses of shipping and handling the Assets in connection with the transfer of the Assets to Buyer after the Closing and their removal from the Premises.

3.  Conditions Precedent to the Initial Closing.

3.1   Conditions to Seller's Obligations. Seller's obligation to make the deliveries required of Seller on the Closing Date and to otherwise consummate the transactions contemplated herein on the Closing Date shall be subject to the satisfaction or waiver by Seller of each of the following conditions:

3.1.1 All of the representations and warranties of Buyer contained herein shall continue to be true and correct at such Closing in all material respects.

3.1.2 Buyer shall have delivered, or shall be prepared to deliver at such Closing, all Good Funds and documents required of Buyer to be delivered at such Closing.

3.1.3 Buyer shall have delivered to Seller appropriate evidence of all necessary limited liability company action by Buyer in connection with the transactions contemplated hereby, including, without limitation: (i) certified copies of resolutions duly adopted by Buyer's directors, managers and/or members approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by Buyer of this Agreement; (ii) a certificate as to the incumbency of officers of Buyer executing this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement; (iii) a copy of Buyer's limited liability company operating agreements (as amended or restated) and any by-laws.

8

3.1.4    No order, injunction, judgment, decree, ruling, writ, assessment or arbitration award ("Order") of a court, tribunal or governmental authority shall be in effect in any action, suit or other proceedings pending before any court, tribunal or governmental authority that restrains or prohibits the consummation of the transactions contemplated by this Agreement.

3.1.5    Buyer shall have performed or tendered performance in all material respects of each and every material covenant on Buyer's part to be performed which, by its terms, is capable of performance before such Closing.

3.1.6    The Approval Order shall have been entered in the docket of the Case, which shall be in form and content reasonably satisfactory to Seller, Committee and DIP Lender, and which shall not be stayed as of the time of such Closing on the Closing Date.

3.1.7    NHTSA shall have approved, consented to or stated in writing (which may be electronic, such as by email or in NHTSA's portal) that it does not object to a remedy for the Upfitted Vehicles that was proposed to it by the Seller, so long as such remedy[7] shall relieve Seller of any and all potential liability under Sections 30112 and 30165 of title 49 of the United States Code.

3.2    <u>Conditions to Buyer's Obligations</u>.  Buyer's obligation to make the deliveries required of Buyer on the Closing Date and to otherwise consummate the transactions contemplated herein on the Closing Date shall be subject to the satisfaction or waiver by Buyer of each of the following conditions:

3.2.1    Seller shall have performed or tendered performance in all material respects of each and every material covenant on Seller's part to be performed which, by its terms, is capable of performance before such Closing.

3.2.2    All of the representations and warranties of the Seller contained herein shall continue to be true and correct at such Closing in all material respects unless failure to be so true and correct will not have a material adverse effect on the Assets.

3.2.3    Seller shall have (a) executed and be prepared to deliver to Buyer the Bill of Sale and (b) be prepared to deliver to Buyer the MSOs, in each case for the Assets purchased on such date.

3.2.4    No Order of a court, tribunal or governmental authority shall be in effect in any action, suit or other proceedings pending before any court, tribunal or governmental authority that restrains or prohibits the consummation of the transactions contemplated by this Agreement.[8]

---

[7] For <u>Sections 3.1.7 and 3.2.6</u>, the word "remedy" is used in Section 30120 of title 49 of the United States Code.

[8] <u>Provided</u>, <u>however</u>, if the such action, suit or other proceeding shall relate solely to any or all of the Dismantled Vehicles, the Buyer shall remain obligated to buy the On-Site Upfitted Vehicles and the On-

9

3.2.5   The Approval Order shall have been entered in the docket of the Case, which shall be in form and content reasonably satisfactory to Seller, Committee and DIP Lender, and which shall not be stayed as of the time of Closing on the Closing Date.

3.2.6   NHTSA shall have approved, consented to or stated in writing (which may be electronic, such as by email or in NHTSA's portal) that it does not object to a remedy for the Upfitted Vehicles that was proposed to it by the Seller.

3.3   <u>Termination</u>.  Notwithstanding anything to the contrary contained herein, this Agreement may be terminated at any time prior to the Closing Date by written notice from the terminating Party to the other Party only as follows:

3.3.1   by Seller or Buyer if (i) any court of competent jurisdiction or other governmental authority shall have entered an order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such order shall have become final and nonappealable; <u>provided</u>, <u>however</u>, that the Party seeking to terminate this Agreement pursuant to this subsection shall have used commercially reasonable efforts to have such order vacated or (ii) the Closing shall not have occurred on or before the sixty-fifth (65th) day (if a business day or if not the next business day) after the execution and delivery of this Agreement by both Parties (which date may be extended by the Parties, subject, in the case of Seller, to the consent of the Committee and the DIP Lender) (the "<u>Outside Date</u>"); <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this clause (ii) shall not be available to any Party whose breach or failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to be consummated by the Outside Date or if Buyer is serving as the Back-up Bidder;

3.3.2   by Seller, if (A) Buyer shall have breached in any material respect any of its representations or warranties or shall have breached or failed to perform or comply with any of its covenants or agreements in this Agreement in any material respect; (B) such breach or failure cannot be cured or has not been cured within thirty (30) days after the giving of written notice by Seller to Buyer specifying such breach or failure; and (C) such breach or failure, individually or in the aggregate together with all other such breaches and failures by Buyer, makes or will make the satisfaction of one or more of the conditions in Section 3.1 impossible; provided, Seller may not terminate this Agreement pursuant to this clause if Seller is then in breach of this Agreement in any material respect; and

3.3.3   by Seller or Buyer, upon (i) any announcement by the Seller at an auction held in accordance with the Bidding Procedures Order (as defined

---

Site Demo Vehicles for which the On-Site Upfitted Vehicles Cash Amount and the On-Site Demo Vehicles Cash Amount, respectively, would apply for purposes of calculating the Purchase Price, or if only a portion of the Dismantled Vehicles is subject to such action, suit or other proceeding, then the Dismantled Vehicles Cash Amount shall be adjusted and/or pro rated, as appropriate, for purposes of calculating the Purchase Price.

DOCS_LA:323381.1 47430/002

below) that the final bid of Buyer at such auction is not the successful bid (unless such bid by Buyer is the Back-up Bid) or (ii) the consummation of an Alternative Transaction. "Alternative Transaction" means a transaction involving a sale of all or substantially all of the Assets to a person or persons other than Buyer.

3.4    Effect of Termination.

3.4.1    In the event that this Agreement is validly terminated as provided herein prior to the Closing Date, then each of the Parties shall be relieved of its duties, covenants, agreements and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Buyer or Seller, subject to Section 3.4.2 and, to the extent required by the terms hereof, the Deposit shall be returned to the Buyer as provided herein.

3.4.2    NOTHING IN THIS SECTION 3.4 SHALL RELIEVE BUYER OR SELLER OF ANY LIABILITY FOR A BREACH OF THIS AGREEMENT PRIOR TO THE DATE OF TERMINATION; PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANY PROVISION CONTAINED IN THIS AGREEMENT, SELLER'S LIABILITY UNDER THIS AGREEMENT FOR ANY AND ALL SUCH BREACHES SHALL BE LIMITED ONLY TO THE RETURN OF THE DEPOSIT. THE PARTIES AGREE THAT THE RETURN OF THE DEPOSIT BY SELLER AS PROVIDED FOR ABOVE IS REASONABLE IN LIGHT OF THE ANTICIPATED OR ACTUAL HARM CAUSED BY ANY SUCH BREACH PRIOR TO THE DATE OF TERMINATION OR THE CLOSING BY SELLER, THE DIFFICULTIES OF PROOF OF LOSS ARISING FROM SUCH BREACH, AND THE INCONVENIENCE OR INFEASIBILITY OF OTHERWISE OBTAINING AN ADEQUATE REMEDY FOR SUCH BREACH.

4.    Seller's Representations and Warranties.    Seller hereby makes the following representations and warranties to Buyer:

4.1    Validity of Agreement.    Subject to Bankruptcy Court approval, this Agreement shall constitute the valid and binding obligation of Seller enforceable in accordance with its terms.

4.2    Organization, Standing and Power.    Subject to the applicable provisions of the Bankruptcy Code, Seller has all requisite corporate power and authority to execute, deliver and (subject to Bankruptcy Court approval) perform this Agreement and all writings related thereto.

4.3    Authorization of Seller.    The proposed Approval Order sought by the Seller shall approve the execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and authorize the performance of, fulfillment of and compliance with the terms and conditions hereof.

4.4    Recall Notices.    If the condition set forth in Section 3.1.7 is satisfied, the recall notices for the Upfitted Vehicles do not preclude the sale of the Upfitted Vehicles to the Buyer, subject to Bankruptcy Court approval. The Seller agrees to cooperate with Buyer and NHTSA, as needed, to facilitate Buyer's compliance with NHTSA's requirements but shall not be required to incur any out-of-pocket expenses in

11

connection with such cooperation (such agreement to cooperate shall terminate six (6) months from the Closing Date, unless extended in writing by the Seller after consultation with the Committee and DIP Lender).

5. <u>Buyer's Warranties and Representations</u>.  Buyer hereby makes the following representations and warranties to Seller:

5.1    <u>Validity of Agreement</u>.  All action on the part of Buyer necessary for the authorization, execution, delivery and performance of this Agreement by Buyer, including, but not limited to, the performance of Buyer's obligations hereunder, has been taken.  This Agreement, when executed and delivered by Buyer, shall constitute the valid and binding obligation of Buyer enforceable in accordance with its terms.

5.2    <u>Organization, Standing and Power</u>.  ~~Each of the entities comprising the~~ Buyer is a ~~limited liability company~~corporation duly organized, validly existing and in good standing under the laws of the State of ~~Utah.  Each such~~North Carolina. , Buyer has all requisite ~~limited liability company~~corporate power and authority to own, lease and operate its properties, to carry on its business as now being conducted and to execute, deliver and perform this Agreement and all writings relating hereto.

*[Formatted: Font: Bold]*

5.3    <u>Authorization of Buyer</u>.  The execution, delivery and performance of this Agreement and all writings relating hereto by Buyer have been duly and validly authorized.  The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer do not and will not: (i) conflict with or result in a breach of the limited liability company operating agreement or by-laws of each Buyer; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which each Buyer is a party or by which Buyer or its assets or properties may be bound.

5.4    <u>Financial Capability</u>.  Buyer (a) has as of the date hereof, and at each Closing will have, sufficient funds available to pay the Purchase Price and any expenses incurred by Buyer in connection with the transactions contemplated by this Agreement, (b) has as of the date hereof, and at each Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (c) has not incurred any obligation, commitment, restriction or Liabilities of any kind, which would impair or adversely affect such resources and capabilities.  After giving effect to this Agreement and the transactions contemplated hereby, each Buyer will be solvent as of each Closing.

6. <u>"As Is" Sale</u>.  IT IS UNDERSTOOD AND AGREED THAT, EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO PHYSICAL CONDITION, REGULATORY COMPLIANCE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  IN FACT, SELLER HAS INFORMED BUYER AND BUYER

12

ACKNOWLEDGES AND AGREES THAT THE UPFITTED VEHICLES MAY NOT
BE SOLD OR LEASED TO CONSUMERS BECAUSE THEY ARE SUBJECT TO
ONE OR BOTH OF THE RECALLS, THAT THE SELLER IS NOT PROVIDING ANY
PRODUCT OR SERVICE WARRANTIES FOR ANY OF THE ASSETS AND THAT
SOME OR ALL OF THE ASSETS MAY NOT BE COVERED UNDER ANY
MANUFACTURER'S PRODUCT OR SERVICE WARRANTIES OR ANY OTHER
PRODUCT OR SERVICE WARRANTIES.    BUYER ACKNOWLEDGES AND
AGREES THAT, AT EACH CLOSING OR IN CONNECTION WITH ANY LATER
SALE, TRANSFER OR DELIVERY OF ASSETS, SELLER SHALL SELL AND
CONVEY TO BUYER AND BUYER SHALL ACCEPT THE ASSETS "AS IS,
WHERE IS, WITH ALL FAULTS." BUYER HAS NOT RELIED UPON AND WILL
NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY
EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS,
REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR
RELATING THERETO MADE OR FURNISHED BY SELLER OR ITS
REPRESENTATIVES TO WHOMEVER MADE OR GIVEN, DIRECTLY OR
INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED
HEREIN.   BUYER ALSO ACKNOWLEDGES THAT THE PURCHASE PRICE
REFLECTS AND TAKES INTO ACCOUNT THAT THE ASSETS ARE BEING SOLD
"AS IS, WHERE IS, WITH ALL FAULTS."   BUYER ACKNOWLEDGES TO
SELLER THAT BUYER HAS HAD THE OPPORTUNITY TO CONDUCT SUCH
INSPECTIONS AND INVESTIGATIONS OF THE ASSETS AS BUYER DEEMS
NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE ASSETS AND ITS
ACQUISITION THEREOF.  BUYER FURTHER WARRANTS AND REPRESENTS
TO SELLER THAT BUYER WILL RELY SOLELY ON ITS OWN REVIEW AND
OTHER INSPECTIONS AND INVESTIGATIONS IN THIS TRANSACTION AND
NOT UPON THE INFORMATION PROVIDED BY OR ON BEHALF OF SELLER,
OR ITS AGENTS, EMPLOYEES OR REPRESENTATIVES WITH RESPECT
THERETO. BUYER HEREBY ASSUMES THE RISK THAT ADVERSE MATTERS,
INCLUDING, BUT NOT LIMITED TO, LATENT OR PATENT DEFECTS,
ADVERSE PHYSICAL OR OTHER ADVERSE MATTERS, MAY NOT HAVE BEEN
REVEALED BY BUYER'S REVIEW AND INSPECTIONS AND INVESTIGATIONS.

7.  Compliance with Laws and Regulations.  Buyer acknowledges that the Seller
has received recall notices from NHTSA concerning the Recalls of the Upfitted Vehicles.
Buyer agrees and covenants to (a) satisfy and comply with all of NHTSA's requirements
in such recall notices and any future recall notices with respect to the Assets; (b) comply
with all applicable laws, rules and regulations in respect of the Assets, including (without
limitation) the National Traffic and Motor Vehicle Safety Act (as amended), related
regulations and NHTSA's requirements; and (c) ensure that before Buyer sells, leases,
transfers or otherwise disposes of Assets to third parties,  such Assets are compliant with
applicable laws, rules and regulations and safe for use.  The obligations of the Buyer set
forth in this Section shall survive Closing indefinitely.

8.  Bankruptcy Court Approval of Sale Procedures.  Within three (3)  business
days after the execution and delivery of this Agreement by both of the Parties (which
period may be extended by mutual consent of the Parties in writing, after the Seller has

13

DOCS_LA:323381.4 47430/002

consulted with the Committee and DIP Lender), the Seller shall request by the Bidding Procedures and Sale Motion, and use reasonable good faith efforts to obtain from the Bankruptcy Court, an order (the "Bidding Procedures Order") in form and substance reasonably acceptable to the Seller, Buyer, Committee and DIP Lender that approves the following bidding procedures and expense reimbursements (the "Bidding Procedures"): (i) Buyer shall be entitled to receive from the Seller a payment in the amount of $200,000 (the "Break-up Fee and Expense Reimbursement") in the event that Buyer has complied, in all material respects, with all agreements, obligations and covenants to be performed by or on its behalf through the date of termination of this Agreement, the Procedures Order has been entered and this Agreement is terminated pursuant to Section 3.3.3, which payment shall be made to the Buyer by the purchaser in an Alternative Transaction concurrently with the consummation of such third party sale; (ii) all third party offers to be considered at the hearing (the "Sale Hearing") on the Bidding Procedures and Sale Motion shall be in writing accompanied by a deposit (in the form of a cashier's check, wire transfer or other cash equivalent) in the amount of five percent (5%) of such third party's aggregate bid amount and delivered to the Seller so that it is received by the Seller no later than four (4) business days prior to the Sale Hearing, together with evidence satisfactory to Seller in its discretion (after consulting with the Committee and DIP Lender) of such third party's financial and operational ability to perform its obligations under such offer; (iii) no prospective purchaser will be permitted to bid at the Sale Hearing unless such party has been deemed "financially qualified" by the Seller (after consultation with the Committee and DIP Lender); (iv) no prospective purchaser who bids for the Assets at the hearing on Buyer's acquisition of the Assets shall be entitled to purchase the Assets unless such prospective purchaser offers to purchase all of the Assets for consideration of at least $125,000 greater than the Purchase Price and otherwise on terms at least as favorable overall to the Seller as those set forth in this Agreement; (v) after any initial overbid, all further overbids must be in increments of $25,000; (vi) any bidder that is not an Excluded Purchaser shall be obligated to pay the Consultant's Fee, which is a buyer's premium that is required to be paid to the Consultant (as such terms Excluded Purchaser, Consultant's Fee and Consultant are defined in the "Exclusive Disposition Agreement" that has been designated as Docket No. 85-2 in the Case); and (vii) the Buyer shall have the right to overbid the highest final bid (subject to additional bidding by all bidders each time the Buyer overbids a third-party's final bid). Should overbidding take place, the Buyer shall have the right, but not the obligation, to participate in the overbidding and to be approved as the overbidder at the hearing on the Bidding Procedures and Sale Motion based upon any such overbid. If a bidder is not the successful bidder, but has the next highest or otherwise best qualified bid, then its bid shall become a Back-up Bid (as defined below), which shall remain open for acceptance by Seller until the closing of an Alternative Transaction or as otherwise provided for in the Bidding Procedures Order or the Approval Order, but subject and subordinate in all respects to the rights of the successful bidder. Notwithstanding anything else to the contrary herein, the entry of an order of the Bankruptcy Court approving the Bidding Procedures shall not be a condition precedent to the Buyer's obligations under this Agreement, provided that the Sale to Buyer pursuant to the terms of this Agreement is otherwise approved by the Bankruptcy Court.

14

9. <u>Bankruptcy Court Approval of Sale</u>. The Bidding Procedures and Sale Motion shall seek an Approval Order that, if the Buyer is the successful bidder (i) approves the Sale of the Assets to Buyer on the terms and conditions set forth in this Agreement and authorizes the Seller to proceed with the Sale, (ii) includes a specific finding that Buyer is a good faith purchaser of the Assets, and (iii) states that the sale of the Assets to Buyer shall be free and clear of liens, claims, interests and encumbrances (other than any Assumed Liabilities). Following the filing of the Bidding Procedures and Sale Motion, Buyer and Seller shall use commercially reasonable efforts to obtain the Approval Order. Both Buyer's and Seller's obligations to consummate the transactions contemplated in this Agreement and which the Buyer and Seller may hereafter enter into shall be conditioned upon the Bankruptcy Court's entry of the Approval Order and such order remaining unstayed. If a third party purchaser for the Assets or any material portion thereof is approved by the Bankruptcy Court at the Sale Hearing as the successful bidder, then this Agreement shall automatically terminate, the Seller and the Buyer shall be relieved of any further liability or obligation hereunder other than the Seller's return of the Deposit to the Buyer within three (3) business days after the later of the Sale Hearing or the date the Buyer's bid is no longer a Back-up bid (as defined below) and, to the extent payable in accordance with the terms hereof, payment of Break-up Fee and Expense Reimbursement to the Buyer within three (3) business days after closing of the Alternative Transaction. In the event that a third party (an "<u>Upset Purchaser</u>" and the underlying agreement between the Upset Purchaser and Seller, the "<u>Upset Agreement</u>") is approved by the Bankruptcy Court as the purchaser of the Assets at the Sale Hearing, however, notwithstanding anything to the contrary in this Agreement, this Agreement shall not terminate, but rather shall become a "<u>Back-up Bid</u>" which shall remain open for acceptance by Seller until the closing of an Alternative Transaction or as otherwise provided for in the Bidding Procedures Order or Approval Order, but subject and subordinate in all respects to the rights of the Upset Purchaser under the Upset Agreement.

10. <u>Indemnification and Contribution</u>. Provided that the Closing occurs in favor of the Buyer, Buyer hereby holds harmless and indemnifies and agrees to pay the Seller, the members of the Committee, any liquidating trustee on behalf of creditors, DIP Lender and the Prepetition Lenders (as such term is defined in the motion designated as Docket No. 7 in the Case), CRO, directors, officers, employees, equityholders and their respective staff, professionals and affiliates (each an "<u>Indemnitee</u>" and collectively the "<u>Indemnitees</u>") for any loss, Liability, claim, damage, expense (including without limitation reasonable attorneys' fees and expenses through all levels of appeal) (collectively, a "<u>Claim</u>") suffered or incurred by an Indemnitee arising from, in connection with or related to any Asset on or after the Closing Date, or with respect to any post-Closing Date transfer of any Additional Assets, as of the date of such transfer (collectively, an "<u>Indemnified Claim</u>"), including, without limitation, any such losses, Liabilities, claims, damages and expenses arising from, in connection with or related to (i) any person injured or killed in or by an Asset; (ii) any person or entity that suffered any property damage caused by an Asset; (iii) a third party who purchases or purchased an Asset from the Buyer (or any affiliates); (iv) any subsequent purchaser of such an Asset; (v) NHTSA or other regulatory or legal body; or (vi) any insurer, lender or other

15

claimholder with respect to any of the foregoing. To defend any Indemnified Claim, the Buyer shall select counsel that is reasonably acceptable to the relevant Indemnitees. Buyer hereby fully and finally irrevocably releases the Indemnities from any and all Indemnified Claims. If the indemnification provided for in this Agreement is unavailable to an Indemnitee for any reason whatsoever then, to the fullest extent permissible under applicable law and public policy, the Buyer, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for expenses, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such proceeding in order to reflect (i) the relative benefits received by the Buyer and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such proceeding; and/or (ii) the relative fault of the Buyer (and its directors, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s). For clarification, as set forth in Section 2.8 above (and without limiting such Section or this Section), the Buyer holds harmless and indemnifies (and shall contribute to) and pay the Indemnities regarding any loss, Liability, claim, damage or expense (including, without limitation, reasonable attorney's fees and expense through all levels of appeal) arising from, in connection with or related to the Buyer's removal of any of the Assets from the Premises. -Also for clarification, Buyer agrees that the coverage amounts under its Liability Insurance Policy or any other insurance shall not be deemed to limit Buyer's obligations to the Indemnitees under this Section.

11. <u>Named Insured</u>. The Buyer shall add the Seller, CRO and any liquidating trustee (and any of the entities comprising the Buyer that are not named insureds) as a named insured on the Buyer's Liability Insurance Policy that are in effect as of the Closing Date and any future similar policies. The Buyer shall be obligated to pay any deductible or co-payment. The Buyer agrees that the coverage amounts under such Liability Insurance Policy or similar policies shall not be deemed to limit Buyer's indemnification and contribution obligations to Indemnitees.

12. <u>Miscellaneous</u>.

12.1    <u>Damage and Destruction</u>. Seller shall notify Buyer immediately of the occurrence of any damage to or destruction of any material Assets that occurs prior to the Closing Date, or the institution or maintenance of any condemnation or similar proceedings with respect to the Assets. In the event of any damage to or destruction of any material Assets which is not fully covered by insurance, or in the event any such condemnation or other proceedings are instituted or maintained, Buyer shall still be obligated to purchase the undamaged Assets and, at its option, may either (i) terminate this Agreement as to the damaged or destroyed assets, or (ii) consummate the purchase of such damaged or destroyed Assets provided for by this Agreement. In all other events or in the event that Buyer elects to consummate the purchase pursuant to (ii) above, all insurance or condemnation proceeds, including business interruption and rental loss proceeds, collected by Seller prior to the Closing Date with respect to the damaged or destroyed Assets, together with an amount equal to all deductible amounts under the insurance policies covering such damage or destruction and amounts not covered by insurance (which amounts shall be agreed upon in good faith by Seller and Buyer and

16

approved by the Bankruptcy Court), shall be credited against the Cash Amount on Buyer's account.  Notwithstanding anything to the contrary herein, the risk of loss or damage to the Assets shall shift to the Buyer on the Closing Date, irrespective of where the Assets are located as of such date and whether Buyer has yet removed or had the opportunity to remove the Assets.

12.2    _Modification of Assets._  The Seller does not plan to modify any Assets; however, if the Seller materially and adversely modifies any of the Assets between the date of execution and delivery of this Agreement by the Buyer and Closing, such materially and adversely modified Assets shall no longer be "Assets" and shall be excluded from the Sale, with the Purchase Price proportionally adjusted.

12.3    _Notice of Certain Events._  The Buyer and Seller shall notify the other promptly of the receipt (for the Seller, by its CRO) of any notice or communication (whether written or verbal) at any time asserting or threatening any and all losses, Liabilities, claims, damages and expenses by or on behalf of:  (a) any person injured or killed in or by an Asset; (b) any person or entity that suffered any property damage caused by an Asset; (c) a third party who purchases or purchased an Asset from the Seller or Buyer (or any affiliates); (d) any subsequent purchaser of such an Asset; (e) NHTSA or other regulatory or legal body;  or (f) any insurer, lender or other claimholder with respect to any of the foregoing.  The Seller's obligations under this Section shall terminate upon the conversion of the Case to a case under chapter 7 of the Bankruptcy Code or the effective date of any chapter 11 plan; however, any chapter 11 plan proposed by the Seller shall provide that if there is a liquidating trustee, such liquidating trustee shall provide the notice of such threats it receives to the Buyer listed herein.

12.4    _Attorneys' Fees._  In the event that either Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees through all levels of appeal) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

12.5    _Notices._  Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by either Party to the other may be effected by personal delivery in writing, or by registered or certified mail, postage prepaid, return receipt requested or electronic mail, and shall be deemed communicated as of the date of mailing.  Mailed notices shall be addressed as set forth below, but each Party may change his address by written notice in accordance with this paragraph.

| To Seller: | JRV Group USA L.P. |
| | 4502 Brickell Privado |
| | Ontario, CA 91761 |
| | Attn:  Andrew De Camara, |
| | Chief Restructuring Officer |
| | (ad@sherwoodpartners.com) |

17

|  | |
|---|---|
| With a copy to: | Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 91727<br>Attn: Jeffrey W. Dulberg (jdulberg&pszjlaw.com)<br>     Robert M. Saunders (rsaunders@pszjlaw.com)<br>and<br>Pachulski Stang Ziehl & Jones LLP<br>919 N. Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, DE 19899 (Courier 19801)<br>Attn: Colin R. Robinson (crobinson@pszjlaw.com) |

To Buyer: ~~Ken Garff Automotive, LLC~~
~~d/b/a Ken Garff Automotive Group~~Impex Inc.
~~Ken Garff Enterprises, LLC~~
~~Garff-Warner Dodge, LLC~~
d/b/a ~~Ken Garff West Valley Dodge~~
~~Chrysler Jeep Ram~~Impex Auto Sales
~~111 East Broadway, Suite 900~~3512 S. Holden St.
~~Salt Lake City, UT 84111~~
Greensburo, NC 27407
Attn: ~~Michael Creer (mikec@kengarff~~Brady Gibson
(brady.gibson@impexautosales.com)

With a copy to: ~~Bennet Tueller Johnson and Deere~~Gellert Scali
Busenkell & Brown, LLC

~~3165 East Millrock Drive~~1201 N. Orange Street,
Suite ~~500~~300

~~Salt Lake City, UT 84121~~Wilmington, DE 19801
Attn: ~~Barry Johnson (bjohnson@btjd.com)~~Michael
Busenkell, Esq.

12.6   Entire Agreement.   This instrument and the documents to be executed pursuant hereto contain the entire agreement between the Parties relating to the sale of the Assets; provided, however, that nothing in this Section shall be deemed to affect, modify, waive or merge any of the Parties' obligations to each other pursuant to any existing nondisclosure agreement to which they or their affiliates may be a Party. Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

12.7   Modification.   This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the Parties hereto.

12.8   Actions on Closing Date Are Simultaneous.   All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred

18

**Formatted:** Justified

simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

12.9    Severability.    Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

12.10    Captions and Footnotes.    All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.    All footnotes are intended to be part of the enforceable provisions of this Agreement.

12.11    Access to Certain Documents and Records.    At reasonable written request of the Buyer, the Seller shall provide the Buyer with copies of (or electronic access to, such as in a virtual data room or otherwise) documents and records in the CRO's possession or control relating to the ownership of the Assets, upfitting of Upfitted Vehicles and the Recalls, subject to the existing nondisclosure agreement between the Parties, but shall not be required to incur any out-of-pocket expenses in connection therewith.    Such agreement to provide access to such documents and records shall terminate on the earliest of:  (a) the effective date of a chapter 11 plan for the Seller; (b) the conversion of the Case to a case under chapter 7 of the Bankruptcy Code; or (c) six (6) months after the Closing Date, unless extended in writing by the Seller, in its sole discretion, after consultation with the Committee and DIP Lender; however, the Buyer may hold any copies previously provided by the Seller, subject to the nondisclosure agreement..

12.12    Further Assurances.    Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party hereto for the purpose of giving effect to the transactions contemplated herein or the intentions of the Parties with respect thereto; provided, however, that subject to the terms of this Agreement, none of the foregoing shall require any Party take any action that  it reasonably believes would increase its Liabilities or responsibility, or adversely affect its rights under this Agreement or applicable law.

12.13    Waiver.    No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.    No waiver shall be binding unless executed in writing by the Party making the waiver.

12.14    Brokerage Obligations. The Seller and the Buyer each represent and warrant to the other that, such Party has incurred no Liability to any broker or agent with respect to the payment of any commission regarding the consummation of the transaction contemplated hereby, except by the Seller as set forth in Section 6.E of the Exclusive Disposition Agreement for three (3%) of the gross sale amount (as such calculation is made under the terms of the Exclusive Disposition Agreement).    It is agreed that if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Buyer or the Seller in connection with this transaction, all such claims shall be handled and paid

19

by the Party whose actions form the basis of such claim and such Party shall indemnify, defend (with counsel reasonably satisfactory to the Party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the transaction contemplated hereby.

12.15   Payment of Fees and Expenses.   Except otherwise set forth herein, each Party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the transaction described herein.

12.16   Survival.   All representations and warranties in this Agreement, and the covenants, agreements and obligations in this Agreement that are to be performed at or before any Closing, shall not survive such Closing and the consummation of the transactions contemplated hereby, and none of the Parties shall have any Liability to each other after such Closing for any breach thereof.   The Parties agree that the covenants, agreements and obligations contained in this Agreement to be performed after any Closing shall survive such Closing, and, subject to the terms of this Agreement (including, without limitation, Sections 12.27 and 12.29), each Party shall be liable to the other after such Closing for any breach thereof.

12.17   Assignments.   This Agreement shall not be assigned by either Party hereto without the prior written consent of the other Party hereto; provided, however, that this Agreement shall automatically inure to the benefit of any successor to the Seller under the Bankruptcy Code (including, but not limited to any chapter 7 trustee, liquidating trustee, or the like), and any such successor to the Seller under the Bankruptcy Code shall have the same rights as the Seller to enforce this Agreement.

12.18   Binding Effect.   Subject to the provisions of the immediately preceding Section, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties hereto.

12.19   No Third Party Beneficiaries.   The provisions of this Agreement have been negotiated and entered into in exchange for the consideration described herein for the sole benefit of the Parties, as well as the persons and entities that have express rights under this Agreement, including (without limitation) in Sections 2.5.2, 10, 11 and 12.27.   Except as expressly set forth herein or with respect to Sections 2.5.2, 10, 11 and 12.27, there shall be no third party beneficiaries of this Agreement.   No creditor of Seller (other than the DIP Lender and Indemnitees), or purchaser or other transferee of the Assets, shall have any right (a) to assert any direct or indirect claim or suit against Buyer under any provisions of this Agreement, including without limitation Sections 2.5.2, 10, 11 or 12.27, or (b) to reference the provisions of this Agreement as evidence of an assumption of any Liability or legal duty not otherwise existing independent of this Agreement.

12.20   Applicable Law.   This Agreement shall be governed by and construed in accordance with the internal laws of Delaware, without regard to its choice of law principles.

20

12.21   <u>Good Faith</u>.   All Parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

12.22   <u>Construction</u>.   In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

12.23   <u>Counterparts</u>.   This Agreement may be signed in counterparts.   The Parties further agree that this Agreement may be executed by the electronic exchange of facsimile signature pages signed electronically provided that by doing so the Parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

12.24   <u>Time is of the Essence</u>.   Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

12.25   <u>Bankruptcy Court Jurisdiction and Venue</u>.   BUYER AND SELLER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION AND EXCLUSIVE VENUE OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE ASSETS AND/OR ASSUMED LIABILITIES, AND BUYER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION OR EXCLUSIVE VENUE.

12.26   <u>Service of Process</u>.   To the fullest extent permitted by Delaware law, each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 12.5</u>.

12.27   <u>Non-Recourse</u>.   No past, present or future director, officer, employee, agent, advisor, incorporator, member, manager, partner, creditor, equity holder, stockholder, interest holder or other non-Seller affiliate of Seller shall have any Liability for any obligations or Liabilities of Seller under this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated by this Agreement. Without limiting the foregoing, Buyer acknowledges that Andrew De Camara is entering into this Agreement solely in his capacity as representative of the Estate (and not in his individual or any other capacity) and that in the event of Seller's or Mr. De Camara's default hereunder or under any document or instrument executed in furtherance of the transaction contemplated herein, neither Mr. De Camara nor Sherwood Partners, Inc. (which appointed Mr. De Camara as CRO pursuant to the Bankruptcy Court order designated as Docket No. 72 in the Case) shall have no personal or other liability, it being expressly understood that Buyer's recourse in any such event shall be limited solely to filing a claim against the Estate in the Case.

12.28   <u>Injunctive Relief</u>.   Each Party agrees that any breach of this Agreement would constitute irreparable harm and damages at law are an inadequate

DOCS_LA:323381.1 47430/002

remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, either Party is entitled to injunctive relief with respect to any such breach, including specific performance of such covenants or obligations or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants or obligations contained in this Agreement. Each Party hereby waives any requirement for the securing or posting of any bond in connection with any such injunctive relief. The rights set forth in this Section shall be in addition to any other rights that a Party may have at law or in equity pursuant to this Agreement.

12.29 <u>Limitations on Liability</u>.

12.29.1 *Waiver of Claims*. IF THE CLOSING OCCURS, BUYER SHALL BE DEEMED TO HAVE WAIVED, AND HEREBY WAIVES, IN FULL ANY BREACH OF, AND CLAIMS ARISING THEREFROM, ANY OF SELLER'S REPRESENTATIONS OR WARRANTIES, COVENANTS, AGREEMENTS OR OBLIGATIONS THAT ARE TO BE PERFORMED AT OR BEFORE THE CLOSING, WHETHER OR NOT BUYER IS AWARE OF, OR BECOMES AWARE OF, SUCH BREACH BEFORE, AT OR AFTER THE CLOSING.

12.29.2 *Maximum Liability*. NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, IF THE CLOSING OCCURS, IN NO EVENT SHALL SELLER'S AGGREGATE LIABILITY FOR LOSSES ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS, WHETHER RELATING TO A BREACH OF A REPRESENTATION AND WARRANTY, COVENANT, AGREEMENT OR OBLIGATION IN THIS AGREEMENT AND WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OTHER LAWS OR OTHERWISE, EXCEED TEN (10) PERCENT OF THE CASH AMOUNT ("<u>SELLER'S LIABILITY CAP</u>"); <u>PROVIDED, HOWEVER</u>, THAT, SUCH LIMITATION ON LIABILITY SHALL NOT APPLY TO ANY SUCH LOSSES RESULTING FROM, ARISING OUT OF OR RELATING TO ANY FEES AND EXPENSES OWED TO ANY PERSON WHO HAS ACTED, DIRECTLY OR INDIRECTLY, AS A BROKER, FINDER OR FINANCIAL ADVISOR TO SELLER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHICH LOSSES SHALL BE LIMITED TO THE ACTUAL DOLLAR AMOUNT OF SUCH FEES AND EXPENSES). THE PARTIES AGREE THAT SELLER'S LIABILITY CAP IS AN AMOUNT THAT IS REASONABLE IN LIGHT OF THE ANTICIPATED OR ACTUAL HARM CAUSED BY ANY SUCH BREACH CONTEMPLATED ABOVE, THE DIFFICULTIES OF PROOF OF LOSS ARISING FROM SUCH BREACH, AND THE INCONVENIENCE OR INFEASIBILITY OF OTHERWISE OBTAINING AN ADEQUATE REMEDY FOR SUCH BREACH.

12.29.3 *Limitation of Damages*. NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, NO PARTY SHALL BE LIABLE FOR SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES (INCLUDING LOSS OF REVENUE, INCOME OR PROFITS BUT ONLY TO THE EXTENT THE SAME ARE NOT DIRECT DAMAGES), DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR

22

OPPORTUNITY OF ANY OTHER PARTY OR ANY OF SUCH PARTY'S AFFILIATES, WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OTHER LAW OR OTHERWISE; PROVIDED, HOWEVER, THAT SUCH LIMITATIONS SHALL NOT LIMIT ANY PARTY'S RIGHT TO RECOVER CONTRACT DAMAGES IN CONNECTION WITH THE OTHER PARTY'S FAILURE TO CLOSE IN VIOLATION OF THIS AGREEMENT.

[Remainder of page is intentionally blank]

23

DOCS_LA:323381.1 47430/002

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the day and year first above written.

~~KEN GARFF AUTOMOTIVE, LLC,~~
~~IMPEX INC. d/b/~~a ~~Utah limited liability company~~

Impex Auto Sales,

a North Carolina Corporation

By:_____
Name: _____
Its: _____

~~KEN GARFF ENTERPRISES, LLC,~~
~~a Utah limited liability company~~

~~By:_____~~
~~Name: _____~~
~~Its: _____~~

~~GARFF-WARNER DODGE, LLC,~~
~~a Utah limited liability company~~

~~By:_____~~
~~Name: _____~~
~~Its: _____~~

JRV GROUP USA L.P., a Delaware limited partnership and debtor and debtor in possession

By:_____
Name:    Andrew De Camara
Its:    Chief Restructuring ~~Offi~~Officer

24